IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

USDC- GREENBELT
'26 FEB 26 PM 1:24

DELONTA SNOWDEN,

    Plaintiff,

v.

DR. ASRESAHEGN GETACHEW,
WARDEN WILLIAM BAILEY,
STEPHANIE CYRAN, CRNP,

    Defendants.

Civil Action No. 1:25-cv-34-LKG

Dated: February 26, 2026

## MEMORANDUM OPINION

Self-represented Plaintiff Delonta Snowden, who at all times relevant was incarcerated at Eastern Correctional Institution ("ECI"), filed this civil rights complaint asserting that Defendants were deliberately indifferent to his serious medical needs in violation of his right under the Eighth Amendment to remain free from cruel and unusual punishment. ECF No. 7. In response to the Amended Complaint, Defendants Dr. Asresahegn Getachew[1] and Stephanie Cyran, CRNP (collectively "Medical Defendants") filed a Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 24), supported by verified medical records (ECF No. 28). Defendant Warden William Bailey also filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 32. Snowden was given notice of his right to file an opposition response to each of the dispositive motions and of the consequences of failing to do so, but has failed to oppose either motion. ECF Nos. 25, 33. No hearing is required to resolve the pending matters. See D. Md. Local R. 105.6 (2025). For the reasons that follow, Medical Defendants' Motion, construed as a Motion for Summary Judgment, and Warden Bailey's Motion, construed as a Motion to Dismiss, shall be **GRANTED**.

---

[1] The Clerk is directed to correct the spelling of Dr. Getachew's name as reflected in the caption of this Memorandum Opinion.

I.   **Background**

   A.   **Snowden's Claims**

Snowden states that on August 20, 2015, he was shot in his left jaw and, according to doctors at UMMC, almost died.. ECF No. 7 at 5. He arrived at ECI from the Anne Arundel County Detention Center in May of 2016 and claims that since that time, ECF staff has been denying his "medical needs and medication that has left [him] in pain." *Id*.

Snowden claims he is being denied a prescription for Gabapentin to help with his pain "a little" and that he wrote to Warden Bailey about it but never received a response. *Id*. at 6.

In 2023, Snowden claims that Stephanie Cyran, CRNP, denied him medication for over 30 days and in 2024, Dr. Getachew denied him medication for over two weeks two different times that year. *Id*. In his view, this is proof of deliberate indifference. *Id*.

Snowden further alleges that since he is a ward of the state, all staff at ECI is legally liable for "the operation of ECI and the welfare of all the inmates of ECI prison, as well as their medical needs; especially the Warden who is the superintendent of the prison." *Id*.

Snowden describes his injuries as chronic pain that has been left untreated, leading to depression and anxiety. *Id*. He further claims that he was never given a follow up with a neurosurgeon or physical therapy. *Id*. He is seeking one-million dollars in damages from each defendant. *Id*.

   B.   **Medical Defendants' Response**

Defendant Stephanie Cyran, who is a Certified Registered Nurse Practitioner ("CRNP"), provides a declaration in support of Medical Defendants' motion. ECF No. 24-2. There she explains that she is one of many providers at ECI who sees patients and refills prescriptions and denies ever failing to renew a patient's medication when she knew it was expired or was about to expire and it was still medically indicated. *Id*. at 2, ¶ 5. She adds that she does not schedule appointments and only sees patients who are put on her schedule, and she is only aware of patients needing refills when nurses tell her or she has an appointment with them. *Id*.

According to Cyran, Gabapentin is a "Directly Observed Therapy" or "DOT" meaning that Snowden would not be permitted to keep the medication in his cell; rather it would be administered by nursing staff and documented on a monthly Medication Administration Record "MAR." ECF No. 24-2 at 2, ¶ 6. She explains that the typical practice is that these medications are prescribed for 90 or 120 days at a time and are renewed during chronic care clinic visits

which generally occur every three months. *Id.* There are times, however, that chronic care appointments are delayed and medications expire before the patient is seen in which case the nurses are supposed to notify the providers, and request refills for DOT medications before they expire. *Id.* at 2-3, ¶ 6. In Snowden's case, Cyran states that his Gabapentin prescription "inadvertently expired a few times but was quickly renewed once a provider became aware of the issue." *Id.* at 3, ¶ 6. She denies that there was any intention to deprive Snowden of his medication and states his medication was never denied by anyone. *Id.*

On January 3, 2019, Snowden was seen by Physician's Assistant Ruth Campbell after he had been seen by Dr. Krishnaswamy for "chronic complaints of neck pain, radicular pain to left arm and left arm and hand weakness." ECF No. 28-4 at 35. According to the Provider Sick Call record, a neurosurgical consult had been approved but a repeat CT scan was needed. *Id.* The repeat scan was "completed 11/2018." *Id.* Snowden told Campbell the pain was constant and affected his day-to-day living. *Id.* Campbell put in another request for a neurosurgery consultation because the repeat CT scan had been obtained. *Id.* at 33 and 36.

On March 20, 2019, Snowden was seen by Dr. Joshua Robert Olexa, a neurosurgeon at the University of Maryland Medical Center ("UMMC"). ECF No. 28-5 at 5-7. Dr. Olexa examined Snowden and reviewed his CT scan, noting that it was "stable from last CT studies." *Id.* at 6. Notably, Snowden reported to Dr. Olexa that his strength had improved a lot since the injury but that the pain still bothered him. *Id.* at 5. Dr. Olexa's conversation with Snowden was summarized in the record stating that Snowden understood the severity of his injury and "how any possibly surgical attempt is extremely dangerous given the difficulty and location of the injury in relation to the injured artery and bullet fragments." *Id.* at 6. The treatment plan Dr. Olexa formulated included prescribing Gabapentin at 100 mg three times a day, and "titrate up as needed for neuropathic pain." *Id., see also* ECF No. 24-2 at 5, ¶ 9. He further recommended continuation of Physical and Occupational Therapy in order to continue improvement in the strength and dexterity in Snowden's left upper extremity, and for Snowden to return to the Neurosurgery clinic in one-year with a CT scan of the cervical spine without contrast "unless new neurologic changes present (then follow-up should be earlier)." ECF No. 28-5 at 6.

On April 2, 2019, Snowden was seen by Registered Nurse Practitioner ("RNP") Oriaku Ijoma in chronic care clinic ("CCC") for pain management where he reported constant pain from his neck that radiated to his left arm with numbness and "pins and needles" sensations to his left

3

hand. ECF No. 28-4 at 31. Ijoma noted that Snowden had been seen by Dr. Olexa who had prescribed Gabapentin (a.k.a. Neurontin[2]) and physical therapy. *Id.* At this time, Snowden was not taking Gabapentin; rather, he had been on Elavil, used Salon Pas (lidocaine patches), and Ibuprofen without relief. *Id.* Ijoma wrote a Non-Formulary Drug Request for Gabapentin, 100 mg twice a day for 120 days and requested a physical therapy consultation for Snowden. *Id.* at 27-30; 32. The Gabapentin request was approved on April 2, 2019. *Id.* at 25. The physical therapy request was approved for six sessions on July 30, 2019. ECF No. 28-6 at 10.

On July 26, 2019, Cyran saw Snowden for a chronic care visit and prescribed Gabapentin 100 mg twice a day to November 26, 2019. ECF No. 24-2 at 6, ¶ 12; ECF No. 28-4 at 18-24. Dr. Clem approved the prescription on July 29, 2019. *Id.* at 18.

Snowden began physical therapy on August 2, 2019, and completed six sessions after the initial session. ECF No. 28-4 at 11-17; ECF No. 24-2 at 6, ¶ 13.

On November 26, 2019, Cyran again submitted a prescription for Gabapentin 100 mg twice a day for 120 days, which was approved by Dr. Clem. ECF No. 24-2 at 6, ¶ 14; ECF 28-4 at 8-9. When Snowden was seen by Dr. Clayton Raab on December 3, 2019, he noted that the dose of Gabapentin being prescribed was very low and was not doing much, so he increased the dosage to 300 mg twice a day until April 3, 2020, which was later approved by Dr. Clem. ECF No. 28-4 at 4-7.

On March 11, 2020, Snowden was seen for a chronic care visit by CRNP JoVonne Osborne. ECF No. 24-2 at 7, ¶ 15. At that time Snowden had completed physical therapy and his pain was "tolerable" with the new dosage of Gabapentin he was taking. ECF No. 28-4 at 2-3. Osborne wrote a plan to request a repeat CT scan of the cervical spine with a one-month follow-up and to then generate a consultation request for neurosurgery. *Id.* at 3. Osborne's consultation for a CT scan was returned by Utilization Management with an alternative treatment plan, noting that medical necessity was not demonstrated and "clinical surveillance" should be considered "as imaging will not change ultimate management." ECF No. 28-6 at 15. Dr. Clem agreed with the suggested alternative treatment plan on March 31, 2020. *Id.*

On June 12, 2020, Cyran prescribed Gabapentin 300 mg twice a day for 120 days and it was approved on the same day by Dr. Clem. ECF No. 24-2 at 7, ¶ 16; ECF 28-3 at 31-33. On July 6, 2020, Cyran saw Snowden again for chronic care clinic and at this time increased his

---

[2] For purposes of consistency, this medication will be referred to as Gabapentin throughout this opinion.

4

Gabapentin dosage by 100 mg to 400 mg twice per day through November 5, 2020, and continued his bottom bunk pass for one year. ECF No. 24-2 at 7, ¶ 16; ECF 28-3 at 28-30. Snowden was agreeable to the plan because surgery was not medically indicated unless his condition became unstable, which he agreed to warn medical providers about if it occurred. *Id.* The increased dosage of Gabapentin was approved by Dr. Clem. ECF No. 28-3 at 25.

On October 6, 2020, when Snowden was seen for chronic care by PA Campbell, it was noted that consultations for a CT scan and a neurosurgery examination placed by another provider were deferred because Snowden's condition had been stable since March 31, 2020. ECF No. 28-3 at 22. Additionally, the one-year follow-up with neurosurgery was also "on hold since COVID19." *Id.* Campbell prescribed Gabapentin 400 mg twice a day through February 6, 2021, which was approved by Dr. Clem. ECF No. 28-3 at 19-20.

On February 3, 2021, Nurse Practitioner Edward Hendricks updated Snowden's chart to indicate that his Gabapentin 400 mg twice a day was refilled through June 3, 2021. ECF No. 28-3 at 18. Snowden's Gabapentin prescription was refilled again by Cyran on June 6, 2021, for 120 days through October 6, 2021. ECF No. 24-2 at 8, ¶ 18.

On October 19, 2021, Cyran refilled Snowden's Gabapentin prescription again for 120 days, through February 19, 2022. ECF No. 24-2 at 8, ¶ 19; ECF No. 28-3 at 8-9.

On November 11, 2021, Snowden was seen by Dr. Raab for a chronic care visit where he discussed an old injury to his left shoulder. ECF No. 28-3 at 6-7. Snowden told Dr. Raab that he "does not want any other pain meds" because he was doing well on the low dose of Gabapentin. *Id.* at 6. Dr. Raab observed that Snowden "demonstrates full [range of motion] of the left shoulder and moves the arm very rapidly at will with no pain or limitation noted." *Id.* Dr. Raab refilled the Gabapentin prescription 400 mg twice per day through March 11, 2022. *Id.* at 7.

By February 10, 2022, Snowden began reporting that the Gabapentin he was taking was decreasing in its effectiveness. ECF No. 24-2 at 9, ¶ 20. When he saw Nurse Practitioner Deborah Tabulov for a chronic care visit, he complained of a "hitching" motion when moving his left arm, continued weakness, and nerve pain. ECF No. 28-3 at 1. Snowden agreed to a trial increased dose of Gabapentin to see if it would address his pain. *Id.* That same day, Tabulov submitted a non-formulary drug request for 600 mg of Gabapentin, twice a day for 120 days which was approved by Dr. Clem. ECF No. 28-2 at 35-36.

On June 13, 2022, Snowden was seen by Dr. Raab for a chronic care visit to address his pain management. ECF No. 28-2 at 31-33. At that time, Snowden was complaining that his left hand hurt and was demanding to go back to see the neurosurgeon at UMMS for evaluation of the gunshot wound to his neck. *Id.* at 31. Dr. Raab noted that Snowden was supposed to return in 2020 but could not do so because of the COVID pandemic. *Id.* Dr. Raab showed Snowden the x-rays of his left hand, explained it was normal, and discussed it with him; however, Snowden refused to take any "minor pain meds for his pain as 'they do not work' for [him]." *Id.* Dr. Raab agreed to submit a request for a follow up with UMMS neurosurgery following a repeat CT scan but cautioned Snowden that if "all is stable the folks may not approve that visit and the repeat CT." *Id., see also id.* at 26-30. The request for a CT scan was approved on June 28, 2022. ECF No. 28-6 at 18-30.

On July 10, 2022, Cyran updated Snowden's chart and continued his bottom bunk for another year. ECF No. 28-2 at 24-25. Snowden's prescription for Gabapentin, 600 mg twice a day, was also continued through October 10, 2022. *Id.* at 24.

On July 20, 2022, Snowden had a CT scan of his cervical spine. ECF No. 28-5 at 13-16. The results, which were compared to the CT scan he had on November 15, 2018, showed "stable post traumatic changes of the cervical spine." *Id.* at 13. On July 27, 2022, Dr. Raab informed Utilization Management that the CT scan showed that the condition of Snowden's neck was unchanged. ECF No. 28-6 at 25. Based on that result, Dr. Raab did not submit a request for a neurosurgery consult. *Id.*

On September 6, 2022, Snowden was seen by Cyran for a chronic care visit. ECF No. 28-2 at 14-23. At this appointment, the bottom bunk status for Snowden was continued for one year and he was prescribed Gabapentin 600 mg twice a day to January 3, 2023, which was approved by Dr. Clem. *Id., see also* ECF No. 24-2 at 10, ¶ 23.

On December 29, 2022, Dr. Raab submitted a non-formulary drug request for Gabapentin 600 mg twice a day, which was approved by Dr. Getnet Luka. ECF No. 28-2 at 13.

On January 23, 2023, Cyran saw Snowden for a chronic care visit. ECF No. 24-2 at 10, ¶ 24; ECF No. 28-2 at 3-12. She again prescribed Gabapentin at the same dosage for 120 days and it was approved by Dr. Luka. *Id.* That prescription expired on May 22, 2023. ECF No. 24-2 at 10, ¶ 25; ECF No. 27-8 at 24. According to Cyran, Snowden missed doses of Gabapentin throughout the time his prescription was active but he received 60 tablets of Ibuprofen on March

6

7, 2023, and another 30 tablets the same month which he was allowed to keep on his person. *See* ECF No. 27-8 at 24, 26, 28, 30, 32, 34; ECF No. 24-2 at 10-11, ¶ 25.

On June 7, 2023, Snowden wrote a sick call slip complaining that he had not been seen in chronic care for over five months and his Gabapentin prescription had expired, leaving him without medication for his nerve pain for three weeks. ECF No. 28-5 at 3. A notation on the sick call slip states the meds expired on May 22, 2023. *Id*. Cyran notes that while the date on the sick call slip is June 7, it was not received and triaged until June 20, 2023. *Id*. Snowden submitted a second sick call slip on June 16, 2023, stating that his Gabapentin prescription had expired in February. *Id*. at 4. This sick call slip was also not received until June 20, 2023, and contains a falsehood because Snowden had been prescribed Gabapentin from January 23, 2023, through May 22, 2023. ECF No. 24-2 at 11, ¶ 26. Additionally, Snowden received the Gabapentin he was prescribed. *See* ECF No. 27-8 at 24, 26, 28, 32, 34. On June 16, 2023, Cyran performed a chart update and refilled Snowden's Gabapentin prescription for 120 days to October 13, 2023. ECF No. 28-2 at 2.

Admittedly there was a gap between May 22 and June 19, 2023, where Snowden did not receive Gabapentin, but Cyran states that the gap was an inadvertent error and did not represent an intentional attempt to deprive him of his medication. ECF No. 24-2 at 11, ¶ 27. She states that she immediately renewed the medication as soon as she learned it had expired and notes that Snowden had access to Ibuprofen to relieve his pain during this time. *Id*.

Dr. Getachew also denies intentionally allowing Snowden's Gabapentin prescription to lapse, or refusing requests for neurosurgery consultations, or physical therapy. ECF No. 24-3 at 2, ¶¶ 5, 6. Rather, he explains that every time he saw Snowden, "there was nothing further the neurosurgeon could do because he specifically stated in his March 20, 2019 note that any possible surgery attempt could be extremely dangerous given the difficulty and location of the injury in relation to the injured artery and bullet fragments." *Id*. at ¶ 5. Dr. Getachew also did not submit any requests for physical therapy because "every time I saw the patient he was able to move the left arm without any difficulty, reported good arm functioning without any muscle atrophy, and that his pain was well controlled on [Gabapentin]." *Id*., *see also* ECF No. 28 at 26-29; 32-34; 35-36; ECF No. 28-1 at 1-2; 7-10. Dr. Getachew explains that he is made aware of prescriptions expiring when nurses notify him that a patient still needs a medication that has expired, or he sees the patient and reviews their chart. ECF No. 24-3 at 3, ¶ 6.

Snowden received Gabapentin 600 mg twice daily through the months of July and August of 2023, with a few missed doses. ECF No. 24-2 at 12, ¶ 28; *see also* ECF No. 27-8 at 14, 16. Although Snowden was scheduled for a chronic care visit with Dr. Getachew Afre, he did not show up for the appointment. ECF No. 28-1 at 33-34.

On September 18, 2023, Cyran saw Snowden for a chronic care visit and prescribed Gabapentin 600 mg twice a day through January 15, 2024, which was approved by Dr. Paul Matera. ECF No. 28-1 at 25-31. According to Cyran, Snowden regularly received Gabapentin 600 mg twice daily with a few missed doses from September through November 2023. ECF No. 27-8 at 8, 10, 12. In December 2023, he missed several doses. *Id.* at 36; ECF No. 28-5 at 19.

From January 1 - 15, 2024, Snowden received Gabapentin with some doses missing. ECF No. 28-5 at 21. The prescription expired on January 15, 2024, but was restarted in January 31, 2024, and he began receiving it again with a similar pattern of intermittent missed doses through the month of February 2024. *Id.* at 23.

Cyran saw Snowden on January 31, 2024, for a chronic care visit. ECF No. 24-2 at 13, ¶ 32; ECF No. 28-1 at 18-24. The focus of the appointment was on Snowden's concern regarding his worsening left shoulder pain despite doing the exercise program he had been prescribed. *Id.* Cyran noted that he had reduced range of motion in his shoulder as well as crepitus in that joint. *Id.* She prescribed Gabapentin 600 mg twice daily to May 29, 2024, which was approved by Dr. Alves. *Id.* at 24. Cyran also continued Snowden's order for a bottom bunk assignment for another year. *Id.* at 13.

In March, April, and May 2024, Snowden received Gabapentin 600 mg twice a day throughout each month with a few missed doses. ECF No. 28-5 at 25, 27.

Dr. Getachew saw Snowden on May 28, 2024, via telemedicine with the assistance of nurse J. Collins for a chronic care visit. ECF No. 28-1 at 7-10. Snowden reported having numbness and tingling in his left arm, but had no muscle atrophy, could move his arm with minimal difficulty, and Dr. Getachew noted that his pain was effectively managed with Gabapentin as prescribed. *Id.* at 7. Dr. Getachew therefore advised Snowden to continue with the current treatment regimen. *Id.* Although Dr. Getachew intended to renew the Gabapentin prescription, it appears he forgot to do so and it expired the next day, May 29, 2024. *Id.* at 8; *see also* ECF No. 24-3 at 3, ¶ 6. Dr. Getachew states that "there were two instances where I unintentionally forgot to either complete the prescription or the [non-formulary drug request]

even though my intent was clearly to continue the medication. However, missing [Gabapentin] for a short time does not have a significant impact on a patient with chronic pain due to an old injury." *Id.*

On June 2, 2024, Snowden submitted a sick call slip stating his Gabapentin had not been renewed. ECF No. 28-5 at 2. On June 11, 2024, Snowden was seen by RN Amanda Morris who contacted Dr. Getachew regarding his note that Snowden should continue his medication regimen during Snowden's last chronic care visit. ECF No. 28-1 at 5. Dr. Getachew then submitted a non-formulary drug request for Gabapentin 600 mg twice daily for 120 days that was approved by Dr. Alves on June 12, 2024. *Id.* at 4-6. With that correction, Snowden received Gabapentin from June 11 through the end of July 2023, with a few missed doses. ECF No. 28-5 at 29.

Dr. Getachew saw Snowden again on August 27, 2024, via telemedicine for a CCC. ECF No. 28 at 35-36; ECF No. 28-1 at 1-2. Snowden complained of numbness and tingling in his left arm but his pain was still relatively well controlled with Gabapentin. ECF No. 28 at 35. Dr. Getachew renewed the prescription for Gabapentin 600 mg twice daily through November 24, 2024, and submitted a non-formulary drug request, which was approved by the pharmacist, Alyssa B. Reese. ECF No. 28-1 at 3.

In August through October 2024, Snowden received Gabapentin 600 mg twice a day with some missed doses. ECF No. 28-5 at 31, 33, 35.

On November 26, 2024, Dr. Getachew saw Snowden again via telemedicine for a chronic care visit. ECF No. 28 at 32-34. It was again noted that Snowden had good arm function without muscle atrophy and that his pain was relatively well controlled with Gabapentin. *Id.* at 32. Although Dr. Getachew prescribed Gabapentin 600 mg twice a day through February 23, 2025, he forgot to submit the accompanying non-formulary request for the prescription. ECF No. 24-3 at 5, ¶ 11.

On December 10, 2024, Snowden submitted a sick call stating his Gabapentin had not been renewed. ECF No. 28-5 at 1. A note made on the sick call slip, dated December 16, 2024 states that a refill was requested. *Id.* On December 16, 2024, Cyran submitted the missing non-formulary request for the Gabapentin prescription ordered by Dr. Getachew, which was approved by Dr. Alves. ECF No. 28 at 31. After that correction, Snowden received Gabapentin in December 2024 and in January 2025. ECF No. 28-6 at 3, 5.

9

On February 18, 2025, Snowden was seen by Dr. Getachew via telemedicine for a chronic care visit. ECF No. 28 at 26-29. In addition to the Gabapentin prescription, Dr. Getachew prescribed capsaicin cream 0.1% for treatment of Snowden's chronic neuropathic pain; the prescription lasted through June 17, 2025. *Id.*

On February 21, 2025, Cyran saw Snowden for a provider visit. *Id.* at 18-23. Snowden reported taking his medications as prescribed and said he did not need any other medications. *Id.* at 19. Snowden was assessed as medically stable, was provided with another one-year bottom bunk order, and a request for six sessions of physical therapy was placed to address his complaints about his shoulder. *Id.* Utilization management approved the physical therapy request. *Id.* at 16-17.

In February 2025, Snowden continued to receive Gabapentin 600 mg twice a day throughout the month with some missed doses. ECF No. 28-6 at 5, 7.

Based on the medical records submitted and their declarations, the Medical Defendants assert that Snowden has failed to state an Eighth Amendment claim of deliberate indifference to a serious medical need; rather, the medical care he has been provided has been within acceptable bounds of normal medical practice.

### C.     Warden William Bailey

Defendant Warden Bailey asserts in pertinent part that the Amended Complaint fails to allege that he personally participated in any conduct that amounted to a constitutional violation. ECF No. 32. Rather, Snowden simply alleges that Bailey is responsible for everything that occurs at ECI because he is Warden. Bailey therefore claims he is entitled to have the claims against him dismissed as respondeat superior is not a valid theory of liability in § 1983 litigation.

## II.     STANDARD OF REVIEW

In reviewing the complaint in light of a Motion to Dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.,*

534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States explained a "plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Importantly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

While self-represented pleadings are liberally construed, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), this Court maintains an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "A party opposing a properly supported motion for

summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

## III. ANALYSIS

### A. Personal Participation

As asserted by Defendant Warden Bailey, liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). To state a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had actual or constructive knowledge that subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff" (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Here, Snowden makes no claim that Warden Bailey directly participated in any of the medical decisions related to the treatment of his chronic pain. Moreover, correctional personnel are typically not liable for the deliberate indifference of medical staff when they make decisions about medical care. *See Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990) (noting that a warden was entitled to rely upon the health care providers' expertise); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (stating that "[i]f a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable

hands"); *Shelton v. Angelone*, 148 F. Supp. 2d 670, 678 (W.D. Va. 2001) ("Prison personnel may rely on opinion of the medical staff as to the proper course of treatment.").

Warden Bailey's motion, construed as a Motion to Dismiss, will be granted for these reasons.

### B. Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that defendants' acts or omissions amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through

circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

The record before the Court sustains a finding that Snowden has a serious medical need, one that his medical providers acknowledge causes him chronic pain and cannot be corrected with surgery because of the danger surgical intervention carries with it. Snowden's claim that he has not been provided with pain medication to treat his condition is belied by the undisputed record. Although there were brief periods of time when Snowden's Gabapentin prescription expired, as soon as medical providers became aware of that oversight appropriate measures were taken to refill his prescription. "[A]n inadvertent failure to provide adequate medical care" does not amount to deliberate indifference." *Estelle*, 429 U.S. at 105-06, *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *accord Lightsey*, 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference."). Snowden has not alleged any exceptional circumstances that require this Court's consideration of his disagreement with the medical decisions made for his care as a basis for an Eighth Amendment claim. Based on the undisputed record before the Court, Medical Defendants are entitled to summary judgment in their favor.

### IV.   Conclusion

For the reasons stated herein and by separate Order which follows, Medical Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, construed as a Motion for Summary Judgment (ECF No. 24) shall be **GRANTED** and Defendant Warden Bailey's Motion to Dismiss or, in the Alternative, for Summary Judgment, construed as a Motion to Dismiss (ECF No. 32) shall be **GRANTED**.

2-26-26
Date

LYDIA KAY GRIGGSBY
United States District Judge